[Cite as *Spaeth v. State Auto Mut. Ins. Co.*, 2012-Ohio-3813.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 97715**

## PEGGY SPAETH

PLAINTIFF-APPELLANT

vs.

## STATE AUTO. MUTUAL INS. CO., ET AL.

DEFENDANTS-APPELLEES

## JUDGMENT:
## REVERSED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case Nos. CV-753013 and CV-710632

**BEFORE:** Rocco, J., Cooney, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** August 23, 2012

-i-

**ATTORNEYS FOR APPELLANT**

Robert F. Linton, Jr.
Stephen T. Keefe, Jr.
Linton & Hirshman LLC
Hoyt Block Suite 300
700 West St. Clair Avenue
Cleveland, Ohio   44113

Christian R. Patno
McCarthy, Lebit, Crystal &
Liffman Co., LPA
101 Prospect Avenue, West
1800 Midland Building
Cleveland, Ohio 44115

**ATTORNEYS FOR APPELLEE**

John G. Farnan
J. Quinn Dorgan
Shawn W. Maestle
Melanie R. Shaerban
Weston Hurd LLP
The Tower at Erieview
1301 East 9th Street, Suite 1900
Cleveland, Ohio 44114-1862

KENNETH A. ROCCO, J.:

{¶1} Plaintiff-appellant Peggy Spaeth appeals from the trial court's order granting summary judgment in favor of defendant-appellee The Cincinnati Insurance Company ("CIC") on her claim for an extension of coverage under an umbrella insurance policy issued by CIC (the "Policy") to James Schill and his wife, Jean Schill. Spaeth sought to extend coverage under the Policy to the Schills' biological son, Robert Schill, against whom she brought a wrongful death action.

{¶2} In granting CIC's motion, the trial court concluded there is no extension of coverage under an umbrella policy when a relative does not reside both in the named insured's household and have the same legal residence of domicile as the named insured, where the policy's definition of "insured" requires a "resident relative" to meet both conditions. The trial court found that James is domiciled in Florida whereas Robert is domiciled in Ohio. The Policy did not, therefore, provide coverage to Robert because Robert and James do not share the same domicile.

{¶3} Spaeth asserts three assignments of error in which she raises the following three issues: whether (1) James is domiciled in Ohio, at least for purposes of coverage under the Policy, (2) a genuine issue of material fact remains for litigation regarding the location of James's domicile, or (3) Robert is an insured under the Policy regardless of the location of James's domicile.

{¶4} Upon a review of the record, this court answers Spaeth's first question in the affirmative. We, therefore, reverse the trial court's grant of summary judgment in favor of CIC, and its denial of Spaeth's motion for summary judgment.

{¶5} On August 16, 2008, Spaeth's husband, Dr. Miles M. Coburn, was riding his bicycle northbound on State Route 44 in Newbury Township. Robert was at the same time driving his motor vehicle southbound on Route 44. At the intersection near State Route 44 and Music Street, Robert crested a hill and struck Coburn, who may have been attempting a left turn onto Music Street. Coburn died as a result of the collision.

{¶6} Robert was driving his personally owned vehicle on August 16, 2008. The vehicle was covered by an automobile liability insurance policy issued by State Automobile Insurance Company and State Automobile Mutual Insurance Company (collectively, "State Auto"). The policy had a coverage limit of $500,000.

{¶7} On November 19, 2009, Spaeth filed a wrongful death action against Robert and State Auto, Cuyahoga C.P. No. CV-710632. After settlement, Spaeth dismissed her claims against State Auto on July 23, 2010.

{¶8} On April 11, 2011, Robert filed a declaratory judgment action after CIC denied him coverage under the Policy, Cuyahoga C.P. No. CV-753013. Robert sought a declaration that he is an "insured" under the Policy by arguing (1) he is James's blood relative, (2) he is a resident of James's household, and (3) he has the same legal residence of domicile as James. CIC countered that James can have only one "legal residence of

domicile" and it is in Florida. Because Robert is domiciled in Ohio, Robert is not entitled to coverage under the Policy.

{¶9} After the trial court consolidated the wrongful death and declaratory judgment actions, all parties filed motions for summary judgment on the issue of James's domicile. The trial court agreed with CIC and granted its motion for summary judgment, and denied Spaeth's and Robert's motions for summary judgment.

{¶10} The parties entered into a global confidential settlement agreement in which the sole remaining issue is liability coverage for Robert under the Policy. Although Robert had separate counsel below, he assigned his claim for coverage under the Policy to Spaeth as administrator of Coburn's estate.

{¶11} Spaeth now appeals and presents the following assignments of error:

1. The trial court erred in granting summary judgment in favor of Defendant-Appellee The Cincinnati Insurance Company (See Journal Entries of 11/17/11, 11/18/11, and Nunc Pro Tunc Journal Entry of 2/28/12).

2. The trial court erred in denying summary judgment motions of Appellant-Assignee Peggy Spaeth and her Assignor, Robert J. Schill (See Journal Entries of 11/17/11, 11/18/11, and Nunc Pro Tunc Journal Entry of 2/28/12).

3. Alternatively, and at a minimum, if there are genuine issues of disputed facts on where an insured is domiciled for purposes of providing liability coverage under this umbrella policy, the issue must be resolved by a jury, instead of on summary judgment (See Journal Entries of 11/17/11, 11/18/11, and Nunc Pro Tunc Journal Entry of 2/28/12).

{¶12} A declaratory judgment action allows a court of record to declare the rights, status, and other legal relations of the parties. Civ.R. 57 and R.C. Chapter 2721. Such

an action is an appropriate mechanism for establishing the obligations of an insurer in a controversy between it and its insured as to the fact or extent of liability under a policy. *Lessak v. Metro. Cas. Ins. Co. of N.Y.*, 168 Ohio St. 153, 155, 151 N.E.2d 730 (1958). When a declaratory judgment action is resolved by summary judgment, our review of the trial court's resolution of legal issues is de novo. *King v. W. Res. Group*, 125 Ohio App.3d 1, 5, 707 N.E.2d 947 (7th Dist.1997). The court applies the following test:

> Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor.

*Zivich v. Mentor Soccer Club*, 82 Ohio St.3d 367, 369-370, 1998-Ohio-389, 696 N.E.2d 201.

{¶13} The party moving for summary judgment bears the initial burden of showing there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 1996-Ohio-107, 662 N.E.2d 264. If the moving party satisfies that burden, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's responses, by affidavit or otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E). Identical standards of interpretation are applied to insurance contracts as are applied to other written contracts. *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.*, 64 Ohio St.3d 657, 665, 597 N.E.2d 1096 (1992). We examine the insurance contract as a whole and presume that the intent of the parties is

reflected in the policy's language. *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 509 N.E.2d 411 (1987), paragraph one of the syllabus. Interpretation of a clear and unambiguous insurance contract is a matter of law, subject to de novo review. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108, 652 N.E.2d 684 (1995).

{¶14} With the foregoing principles in mind, we turn to the language of the Policy issued to the Schills. We must initially determine whether James and Robert share the same domicile, or whether there remains a genuine issue of material fact relating to this determination.

{¶15} The Policy contains the following definitions:

Throughout this policy the words "you" and "your" refer to the person named in the Declarations as the Named Insured and his or her legally recognized spouse, provided his or her spouse's legal residence of domicile is the same as theirs.

* * *

6. "Coverage territory" means anywhere.

* * *

11. "Insured":

a. Means:

* * *

(2) For "occurrences" caused by the use of "automobiles":

* * *

(c) "Your resident relatives" for any "occurrence", involving an "automobile" they own, lease, rent or use.

\* \* \*

16. "Resident relative" means:

a. A person related to "you" by blood, marriage or adoption that is a resident of "your household" and whose legal residence of domicile is the same as yours.

\* \* \*

21. "Underlying insurance" means the policies of insurance listed in Schedule A – Schedule of Underlying Insurance and the insurance available to the "insured" under all other insurance policies applicable to the "occurrence." "Underlying insurance" also includes any type of self-insurance or alternative method by which the "insured" arranges for funding of legal liabilities which would also be insured under this policy.

{¶16} The Policy does not define "resident" or "household." Nor does it define "domicile" or "legal residence of domicile."

{¶17} The Declarations Page of the Policy (Policy No. U02 0260766, effective August 24, 2007 to August 24, 2008) identified James and Jean Schill as the Named Insureds. The address listed on the Policy was "16800 Orange Lane, Burton, OH 44021-9212" (the "Ohio House"). The policy limits were $5 million. Although the Schedule of Underlying Insurance specified minimum limits of insurance for bodily injury and property damage to be maintained by "you and your relatives" during the term of the Policy, specific insurance policies were not listed in the schedule.

**{¶18}** The Schills also maintained an Executive Homeowner policy with CIC, Policy No. H04 0260766, effective from August 24, 2007 to August 24, 2008. The Schills were the Named Insureds on this policy, and the address listed was the Burton, Ohio address listed in the Policy. The policy limits were $500,000.

**{¶19}** Finally, the Schills maintained an Executive Homeowner policy with CIC, Policy No. H02 0260766, effective from October 29, 2007 to October 29, 2008. The Schills were the Named Insureds on this policy, but the address listed was "4420 Deerwood Ct., Bonita Springs, FL 34134-8763" (the "Florida House"). The policy limits were $300,000.

**{¶20}** The Policy's insuring agreement provides, in relevant part, CIC will pay on behalf of an insured the ultimate net low that the insured is legally obligated to pay as damages arising out of an occurrence that is in excess of the underlying insurance. Insured, for purposes of occurrences caused by the use of an automobile, means your "resident relatives" for any occurrence involving an automobile they own, lease, rent, or use. "Resident relative" means a person related to you by blood, marriage, or adoption that is a resident of your household *and* whose legal residence of domicile is the same as yours.

**{¶21}** There is no dispute Robert is related to James by blood. In order to qualify as a "resident relative" under the Policy, Robert also needs to reside in James's household *and* his legal residence of domicile. If Robert qualifies as a "resident relative," meaning he resides both in James's household *and* his legal residence of domicile, he is an

"insured" as defined under provision 11(a)(2)(c) of the Policy. Under these circumstances, CIC must pay the ultimate net low that Robert is legally obligated to pay as damages arising out of the August 16, 2008 accident that is in excess of the underlying insurance     If he is not an insured under provision 11(a)(2)(c) of the Policy, CIC has no obligation to provide coverage for any damages as a result of the August 16, 2008 accident.

{¶22} While it is true the Policy does not define "resident" or "reside," this case is distinguishable from the line of cases holding where "resident" or "reside" is not defined, the terms are ambiguous and thus strictly construed against the insurer and liberally in favor of the insured. *E.g.*, *Prudential Prop. & Cas. Ins. Co. v. Koby*, 124 Ohio App.3d 174, 705 N.E.2d 748 (11th Dist.1997). Here, the Policy also requires a resident relative to reside in the Named Insured's "legal residence of domicile."

{¶23} It is a fundamental principle of law that a person must have a domicile. *Senn v. Cleveland*, 8th Dist. No. 84598, 2005-Ohio-765, ¶38. That domicile, in the words of Justice Holmes, is a person's "pre-eminent headquarters." *Williamson v. Osenton*, 232 U.S. 619, 625, 34 S.Ct. 442, 58 L.Ed. 758 (1914). It therefore follows that, while a person may have multiple residences, he may have only one domicile at any one time. *See*, *e.g.*, *State ex rel. Klink v. Eyrich*, 157 Ohio St. 338, 343, 105 N.E.2d 399 (1952).

{¶24} "The burden of proof of domicile rests upon the party whose right to affirmative relief depends upon establishing his domicile or the domicile of another in a

given place." *E. Cleveland v. Landingham*, 97 Ohio App.3d 385, 391, 646 N.E.2d 897 (8th Dist.1994), citing *Indian Hill v. Atkins*, 57 Ohio L. Abs. 210, 90 N.E.2d 161 (1st Dist.1949). In this case, the burden is initially on Spaeth. Evidence was presented to demonstrate that James was born, raised, married, and worked in Ohio at least up until 1993 when his wife purchased a home in Florida. This evidence was sufficient for Spaeth to meet her initial burden of proof. *Landingham*.

{¶25} Once Spaeth established James's domicile in Ohio, the burden then shifted to CIC. "The law in this area is well-established: 'a person is presumed to continue his old domicile until it is clearly shown that he has acquired a new one.'" *Springfield v. Betts*, 114 Ohio App.3d 70, 73, 682 N.E.2d 1025 (2d Dist.1996), quoting 36 Ohio Jurisprudence 3d (1982), Domicile, Section 19. The acquisition of a new domicile requires two elements: the factum, or residence, and the animus, or an intention to remain. *Landingham*, citing *Anderson v. May*, 91 Ohio App. 557, 107 N.E.2d 358 (7th Dist.1951), *rev'd on other grounds*, 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953). *See also Holtz v. Holtz*, 2d Dist. No. 2005-CA-43, 2006-Ohio-1812. The Supreme Court of Ohio, quoting a judgment entry from the Clermont County Probate Court, has consequently emphasized:

> When a person's legal residence is once fixed * * * it requires both fact and intention to change it. In other words, to effect a change in domicile from one locality, country, or state to another, there must be an *actual abandonment of the first domicile*, *coupled with an intention not to return to it*, and there must be a new domicile acquired by actual residence in another place, with the intention of making the last acquired residence a permanent home. The acts of the person must correspond with such purpose. The change of residence must be voluntary; the residence at the place chosen for

the domicile must be actual and to the fact of residence there must be added the animus manendi, which means the mind to remain.

(Emphasis added.) *In re Estate of Hutson*, 165 Ohio St. 115, 119, 133 N.E.2d 347 (1956).

{¶26} Pursuant to *Hutson*, the abandonment of a former domicile and the acquisition of a new one happens only by the concurrence of both the fact of a new residence and the *intent to remain* in that residence. The intention of making the last acquired residence a permanent home must correspond with the acts of the person. *Id.*

{¶27} In support of its position that James changed his domicile from Ohio to Florida, CIC relied on the Schills' move to Florida in 1993. Jean Schill owns the Florida House for which she promptly applied for and obtained a Homestead Exemption. The exemption led to a reduced assessment on the Florida House under Florida tax law based on proof the house was a permanent residence. While he admitted receiving some bills at the Ohio House and keeping a car there, James testified during deposition he does not "reside here." James also testified he considers the Florida House his residence, a "permanent location for all purposes," including tax purposes.

{¶28} James is the CEO and Chairman of ChemTechnologies, Ltd. located in Middlefield, Ohio. He travels to Ohio to work at the business approximately 10 to 15 days per month, and stays at the Ohio House for both cost and convenience. James testified he always intends to return to Florida following completion of business in Ohio.

{¶29} James owns two vehicles. They are both titled in his name and registered in Florida even though he garages one car in Ohio for his use and convenience while in

Ohio. James registered in 1993 to vote in Florida; he has not voted in Ohio since 1993. James also allowed his Ohio driver's license to expire when he obtained a Florida driver's license in 1993.

{¶30} James maintains a Florida bank account in which he receives his Social Security benefits by direct deposit. His personal checking and savings accounts are in Florida. James also receives his personal credit card bills at the Florida House.

{¶31} James's family doctor is located in Florida. All of the Schills' family heirlooms, antiques, treasures, and personal property dear to them are also located in Florida.

{¶32} Finally, James generally spends less than 160 days in Ohio per year. James, a CPA who is no longer in practice, is aware of the Ohio statute that specifies the number of days a person may spend in Ohio without potentially rebutting a presumption that you are not domiciled in Ohio. According to James, he purposely stays in Ohio under the statutory limit to avoid questions about his domicile.

{¶33} Spaeth counters that certain other facts establish James's intent to be domiciled in Ohio, not Florida, at least for insurance purposes. In addition to other evidence, we turn to James's deposition testimony in considering Spaeth's position.

{¶34} James testified with regard to his understanding of the Policy and the Ohio House homeowner policy:

> Q. Did [the insurance agent] ever indicate to you that Robert would be covered under the homeowners insurance for the Orange Lane property?
>
> A. We just never discussed that one way or other.

* * *

A.   I assumed that any title holder to the property would be.   I took it for granted that [the insurance agent] would make sure that any title holder was protected.

Q.   Under that policy with Cincinnati?

A.   Under that policy, m-hm.

Q.   All right.   And that would include Robert as a title holder?

A.   Sure.   Yes.

* * *

Q.   Did the umbrella policy provide coverage to you for both Florida and Ohio to your knowledge?

A.   It was around the clock coverage wherever.   For wherever and whatever.

Q.   For both households, both households, correct?

A.   Yeah.

{¶35} With regard to his future intentions about returning to Ohio for a couple of weeks per month, James testified:

Q.   What was your purpose for moving to Florida in 1993?

A.   Well, we had sold a business in Chardon, Ohio.   We had a very small condominium down there where my wife liked very much.   We thought I was going to retire, so we moved to Florida.   *But I flunked retirement.*

* * *

Q.   As you sit here today, do you intend to stop coming back to Ohio for the middle two weeks at any point in time?

A. As long as I'm physically able, I'm trying to beat JCPenney's record of 99 years.

Q. *So as long as you can come to Ohio for a couple of weeks every month, you will*?

A. *Yes.*

* * *

Q. And are you an active CEO as it relates to ChemTechnologies, aware of its day-to-day operation?

A. You better believe it.

* * *

Q. And whenever you come in from Florida for business purposes, it's always your intent to return to the Orange Lane address to stay at nighttime?

A. Yes.

(Emphasis added.)

{¶36} With regard to James's intentions about limiting his time in Ohio, he testified:

Q. Have you ever filed a formal declaration with the State of Ohio indicating that you are not domiciled in Ohio?

A. No.

* * *

Q. Would it be fair – so you're aware that Ohio has a statute that specifies that if you are in Ohio less than a certain amount of days, you are rebuttably presumed not to be domiciled in Ohio, correct?

A. I am aware of that.
* * *

A.  It used to be, it used to be less than 150, no question.  From 150 to 180 you could state your case.  *Over 180, you're dead.*

\* \* \*

Q. If you were in Ohio less than 150 days, there was no question that you were not domiciled in Ohio, correct?

\* \* \*

A.  Correct.

Q.  And between 150 and 180 days back then, if you were here \* \* \* you could state your case and make the case that you weren't really a resident of Ohio, correct.

A.  Correct.

\* \* \*

Q.  And at all times you were aware of those parameters and you attempted to abide by them, so that there's no question that you were not a resident of Ohio, correct?

\* \* \*

A.  Correct.

Q.  *Have you ever filed what they call an Affidavit of Non-Ohio Domicile or a notice of no Ohio income tax liability with the Ohio Department of Taxation?*

A.  *No.*

(Emphasis added.)

{¶37} As it relates to this line of inquiry, R.C. 5747.24(B)(1) currently provides:

(B)(1) Except as provided in division (B)(2) of this section, an individual who during a taxable year has no more than one hundred eighty-two contact periods in this state, which need not be consecutive, and who during the entire taxable year has at least one abode outside this state, is presumed to

be not domiciled in this state during the taxable year if, on or before the fifteenth day of the fourth month following the close of the taxable year, the individual files with the tax commissioner, on the form prescribed by the commissioner, a statement from the individual verifying that the individual was not domiciled in this state under the division during the taxable year.

* * *

The presumption that the individual was not domiciled in this state is irrebuttable unless the individual fails to timely file the statement as required or makes a false statement. *If the individual fails to file the statement as required or makes a false statement, the individual is presumed under division (C) of this section to have been domiciled in this state the entire taxable year.*

(Emphasis added.)

{¶38} We glean from James's deposition testimony, the following facts and conclusions:

1) James was born, raised, and married in Ohio, and worked here his entire career. He has no current intention to stop working and stop returning to the Ohio House. James intended to "retire" to Florida, but he "flunked retirement."

2) James does not own either the Ohio House or Florida House. His wife owns the Florida House and two-thirds of the Ohio House. Robert owns the remaining one-third of the Ohio House. Moreover, a purchase of a second home alone is a neutral fact that does not meet CIC's burden of proving that James changed his domicile from Ohio to Florida. In other words, the establishment of a Florida residence does not lead to the inescapable conclusion that James abandoned his domicile in Ohio. Finally, because James is not the legal or titled owner of the

Florida House, the fact that Jean Schill obtained a Homestead Exemption under Florida law is irrelevant. *See* Florida Statute 196.031(1)(a).

3) Likewise, it is clear James intended to avoid Ohio state income tax by "moving" to Florida. He understands how crucial it is to remain under the statutory limit in effect otherwise "you're dead." The mere fact he considers Florida his domicile for tax purposes and tracks his time spent in Ohio for these purposes, however, does not automatically lead to the conclusion James abandoned his domicile in Ohio.

4) James never filed any documents with the Ohio tax authorities relating to his "Florida domicile." Just because the Ohio tax authorities have not pursued James for back taxes based on an Ohio domicile does not automatically make Florida James's domicile.

5) James pays for the mortgage, taxes, insurance, utilities, and most, if not all, operating expenses for the Ohio House. James also often discusses with Robert aesthetic and maintenance items to be completed around the Ohio House.

6) Three of James's four children reside in Ohio.

7) While James provides financial support to his other children, he does not pay directly the mortgage, taxes, insurance, utilities, and most, if not all, operating expenses for their homes.

8) James purchased from an Ohio agent the homeowners' and umbrella insurance policies for the Ohio House, and he is identified as the Named Insured on both

policies. Both policies list the Ohio House's address for the Named Insured. The Policy contains Ohio-specific terms and endorsements. As required by law, CIC offered excess uninsured and underinsured coverages to the Schills. Finally, the Policy does not specifically exclude Robert.

9) James, the CEO and Chairman of an Ohio company partially owned by him, travels to Ohio for up to 15 days per month to work at the business and oversee its day-to-day operations. While in Ohio, he generally awakens at 4:00 a.m. and goes to bed at 7:00 p.m., "working in between," for seven days a week. However, we no longer live in a party-line, land-line world. James has available to him a variety of electronic communication devices that he can use daily, if not hourly, to communicate with his Ohio business subordinates from the Florida House, providing them with directions and making business decisions.

10) James lives in the Ohio House when he travels to Ohio. James has a car at the house for his use, along with toiletries, food, and clothing. He sleeps in a first-floor bedroom that is not, to the best of his knowledge, used by anyone else at any time. Robert has a bedroom on the second floor.

11) Jean Schill travels to Ohio a couple of times per year and stays mostly at the Ohio House for up to five weeks at a time. Jean's and James's trips to Ohio sometimes overlap.

12) James has been a general partner of the Schill Family Trust Limited Partnership since 1997. It is an Ohio partnership that includes his four children, including

Robert, as partners. The partnership uses the Ohio House as its mailing address, including on its tax filings. Finally, the partnership owns an interest in ChemTechnologies, Ltd.

13) James's accountant, who reviews his personal taxes and those for his Ohio business and Ohio family partnership, is located in Ohio. James's investment firm and account manager are located in Ohio. James's attorneys who created the Ohio family partnership, and handle his estate plan and legal issues involving his business, are located in Ohio.

14) The fact that James votes in Florida is not dispositive evidence that he changed his domicile to Florida.

{¶39} James is not a typical "snowbird" who travels to Florida for the winter. Because of James's considerable finances, he created two locations in which he carries on important parts of his life. Nonetheless, in reviewing the evidence in Spaeth's favor as required under Civ.R. 56, reasonable minds can come to but one conclusion about the location of James's domicile. *Zivich*, 82 Ohio St.3d 367, 696 N.E.2d 201. Based on the foregoing facts and conclusions, we conclude James never abandoned his domicile in Ohio by virtue of his wife's purchase of a second home in Florida because he travels here and stays at the Ohio House for up to a minimum of two weeks every month to operate an Ohio business as its CEO and Chairman. Through his own admission, James may have intended to make Florida his domicile, but he "flunked retirement" and his actions after

1993 contradict an intention to make Florida a permanent home. *Hutson*, 165 Ohio St. 115, 133 N.E.2d 347.

{¶40} Accordingly, Robert qualifies as a "resident relative" under the Policy because he resides in both James's household *and* his legal residence of domicile. Robert is an "insured" as defined under provision 11(a)(2)(c) of the Policy, and CIC has the obligation to provide coverage under the Policy in excess of underlying insurance as a result of the August 16, 2008 accident.

{¶41} "Underlying insurance" includes insurance available to the "insured" under all other insurance policies applicable to the "occurrence." "Schedule A – Schedule of Underlying Insurance" of the Policy provides, "[i]t is agreed by you and your relatives that the following minimum limits of underlying insurance are in force as of the inception date of this policy and will be maintained during the term of this policy": auto liability with bodily injury limits of $100,000 each person/$300,000 each occurrence, and property damage limits of $100,000 each occurrence.

{¶42} There is no dispute Robert is a relative of the Schills, and he has an automobile insurance policy through State Auto with the required limits of coverage. Robert's State Auto policy is, therefore, "underlying insurance" to the Policy. This is an interpretation of a clear and unambiguous insurance contract. *Kelly*, 31 Ohio St.3d 130, 509 N.E.2d 411; *Nationwide Mut. Fire Ins. Co.,* 73 Ohio St.3d 107, 652 N.E.2d 684.

{¶43} If CIC intended to limit Schedule A to specific insurance policies, including the Schills' homeowner and motor vehicle policies, it should have listed those policies in

Schedule A.  If CIC wanted to place certain parameters around the definition of "legal residence of domicile," it should have included a definition with those parameters in the Policy.  Finally, CIC did not exclude any resident of the domicile, including Robert, from coverage.

{¶44} We, therefore, reverse the trial court's grant of summary judgment in favor of CIC, and its denial of summary judgment against Spaeth.  Pursuant to App.R. 16(B), we order final judgment be entered in favor of Spaeth.

It is ordered that appellant recover from appellee the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
KENNETH A. ROCCO, JUDGE

COLLEEN CONWAY COONEY, P.J., and
SEAN C. GALLAGHER, J., CONCUR