[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Schill v. Cincinnati Ins. Co.,* Slip Opinion No. 2014-Ohio-4527.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2014-OHIO-4527

SCHILL *v*. CINCINNATI INSURANCE COMPANY, APPELLANT; SPAETH, APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Schill v. Cincinnati Ins. Co.,* Slip Opinion No. 2014-Ohio-4527.]

*Insurance—Domicile defined—Domicile is where person has true, fixed, permanent home to which he always has intention of returning—Residence in fact and purpose to make place of residence one's home are essential elements of domicile—Domicile cannot be temporary or transient—Question is one of fact.*

(No. 2012-1866—Submitted November 6, 2013—Decided October 14, 2014.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 97715, 2012-Ohio-3813.

_____

PFEIFER, J.

{¶ 1} In this insurance-coverage case, we address the meaning of the contract term "domicile."  We reiterate this court's previous jurisprudence on the definition of domicile: it is where a person resides, where he intends to remain,

and where he intends to return when away temporarily. In this case, we conclude that the court of appeals erred in determining that the domicile of the policyholder at issue was in Ohio.

Factual and Procedural Background

{¶ 2} On August 16, 2008, Miles Cobrun was riding his bicycle in Geauga County when he was struck by a vehicle driven by Robert Schill ("Robert"). Coburn died later that day from his injuries. His wife, appellee Peggy Spaeth, is the executor of his estate.

{¶ 3} Robert was driving his own vehicle, which was insured under a policy with a liability coverage limit of $500,000. Spaeth filed a wrongful-death action against Robert and his insurer in November 2009. Spaeth settled with the insurer, and Robert then sought additional coverage under the personal umbrella liability policy of his parents, James ("James") and Jean ("Jean") Schill. The umbrella policy was issued by appellant, Cincinnati Insurance Company ("CIC"), and provided coverage to James and Jean during the relevant time period.

{¶ 4} After CIC denied him coverage, Robert filed the instant declaratory-judgment action seeking a declaration that under the umbrella policy issued by CIC to his parents, CIC owes him a duty of indemnification in the wrongful-death case. CIC answered and filed counterclaims against Robert and cross-claims against Spaeth, also for declaratory judgment.

{¶ 5} The trial court consolidated the declaratory-judgment and underlying wrongful-death actions. CIC, Robert, and Spaeth filed motions for summary judgment on the issue of coverage. The trial court granted summary judgment for CIC, and the appellate court reversed. CIC now appeals.

{¶ 6} There is a crucial policy term at issue in regard to coverage for Robert under his parents' CIC umbrella policy. Under the terms of the policy, an "insured" "[f]or 'occurrences' caused by the use of 'automobiles' " includes " '[y]our' 'resident relatives' for any 'occurrence', involving an 'automobile' they

own, lease, rent or use." The policy defines "resident relative" as "[a] person related to 'you' by blood, marriage or adoption that is a resident of 'your' household and whose legal residence of domicile is the same as yours."

{¶ 7} The question is whether Robert was a "resident relative" of James and/or Jean at the time of the accident. There is no dispute that Robert is a blood relative of James and Jean; the only issue in the case is whether Robert shared the same "legal residence of domicile" as one or both of his parents. If, at the time of the accident, Robert shared the same "legal residence of domicile" as one of his parents, he would be considered an insured under the policy for the occurrence at issue.

{¶ 8} Robert is unquestionably a resident of Ohio; at the time of the accident he resided in a house at 16800 Orange Lane in Auburn Township. He owns a one-third interest in the house; his mother, James's wife, owns the remaining interest. Despite her ownership in the house, it is not disputed that Jean is domiciled in Florida. Instead, James's domicile is at the crux of this case.

{¶ 9} James was born and raised in Ohio. Intending to retire, he moved to Bonita Springs, Florida, with Jean in 1993. She owns the Florida home. Jean applied for a homestead exemption on the Bonita Springs property, which entitled her to a reduced assessment on the residence under Florida law, based upon proof that this was her permanent residence and domicile.

{¶ 10} James, however, has not been a constant fixture in the Florida home. As James testified when he was deposed in this case, he "flunked retirement," and for years he has spent approximately two weeks per month in Ohio, working at a business, ChemTechnologies, Ltd. ("ChemTechnologies"), for which he is the chairman and CEO. James testified that he leaves Florida around the eighth or tenth of each month, usually returning to Florida around the twentieth. When in Ohio, he stays at Robert's home in Auburn Township—for "convenience and practicality," since "there aren't any Holiday Inns in this

general area," but the vast majority of his waking time is spent at ChemTechnologies. The business is in Middlefield, about 13 miles from the Auburn Township house. James testified that he rises at 4:00 A.M. and returns to the house in Auburn Township in time to have dinner and to get into bed by 8:00 P.M. He charges ChemTechnologies and a family partnership a per diem when he is in Ohio.

{¶ 11} James keeps a car at the Auburn Township house, but that car is registered in Florida; he has a second car registered in his name that he keeps in Florida. He has maintained a Florida driver's license since 1993 and did not renew his Ohio license after he left Ohio. He and his wife have moved all of their valuable family heirlooms, antiques, treasures, and personal property that is dear to them to Florida. He stated that he has been registered to vote in Florida since 1993 and has not voted in Ohio since that time. His family doctor is located in Florida, as was his dentist. He is registered at a Catholic parish in Florida. James maintains his checking and savings accounts in Florida banks, receives his social security benefits by direct deposit in a Florida bank, and does not file any federal, state, or local income tax returns that list the Ohio home as his residence. He keeps all his business records in Florida.

{¶ 12} James testified that there were tax reasons for moving to Florida—specifically, Florida's lack of an income tax on individuals. James is well aware of the statutory requirements for avoiding a presumed Ohio domicile for tax purposes. He tailored his time spent in Ohio to total fewer than the number of days that Ohio law considers presumptive evidence of being domiciled in Ohio. He stated that he generally stays in Ohio less than 150 days per year, because "that used to be the statutory period for residency." He stated that he was aware at all times of the pertinent legal requisites for avoiding Ohio residency and attempted to abide by them. He testified that he averages 12.5 days per month in Ohio to make sure that he spends less than 50 percent of his time here. Only once

4

since 1993 has he spent more time in Ohio than in Florida in a given month, the month he underwent dental surgery in Ohio.

{¶ 13} To avoid a presumed Ohio domicile for tax purposes, a person must not only reside at least 182 days a year outside Ohio, but must also file with the Ohio Tax Commissioner a statement confirming that he or she is not domiciled here. R.C. 5747.24(B)(1). James has never filed any such statement.

{¶ 14} When asked whether it is always his intention to return to Florida when his business in Ohio is complete, James responded, "Absolutely. That's where I live." When asked whether Florida is his residence for tax purposes, James responded, "It is my residence, period." However, James has no ownership interest in the Florida house.

{¶ 15} Spaeth argues that James is still domiciled in Ohio. He unquestionably works in Ohio. When asked, "And are you an active CEO as it relates to ChemTechnologies, aware of its day to day operation?," he responded, "You better believe it." He works at ChemTechnologies 12 hours a day, seven days a week when he is in Ohio: "When I come here for business, that's what I spend my time on." He testified that he intends to return to Ohio for the middle two weeks of every month "as long as I'm physically able to. I'm trying to beat J.C. Penney's record of 99 years."

{¶ 16} Although he does not own the Auburn Township house, he pays most of the operating costs associated with the home, including insurance, real estate taxes, utilities, and operating expenses. He uses a bedroom on the first floor of the house. Robert's bedroom is on the second floor. James testified that he pays the utilities and operating expenses because "I utilize them" and because he "provide[s] for the standard of living" for all four of his children. He stated that "most of their day-to-day living expenses, I provide. But not just for Bob, for all of them." Robert and Jean did not yet own the house when Jean and James left Ohio in 1993.

**{¶ 17}** When in Ohio, he attends church at St. Helen's parish and makes contributions there. His accountant is located in Burton, Ohio. The attorneys who handle his estate plan and legal issues for his Ohio business and Ohio family partnership are in Chardon. His investment adviser is in Beachwood, and the insurance agent who obtained coverage is located in Chagrin Falls.

**{¶ 18}** The umbrella policy at issue lists James and Jean as named insureds and their address as the Auburn Township house. James attributes the policy's use of that address to his insurance agent's decision. The Schills also maintained an "executive homeowner" policy with CIC; the Schills were the named insureds on that policy, and the address listed was the Auburn Township house. The policy limits were $500,000. Another executive homeowner policy had limits of $300,000 and covered the Florida residence; both James and Jean were listed as named insureds on that policy and their address was listed as Bonita Springs, Florida. Finally, James used the Auburn Township house address as the principal place of business for the Schill family limited partnership when it was created in 1997; it consists of James and Jean as general partners and their four children as limited partners.

**{¶ 19}** Considering the evidence submitted by the parties, the trial court, finding that no genuine issue of material fact existed, granted summary judgment in favor of CIC. Citing the holding from *Cincinnati Ins. Co. v. Minser*, 2d Dist. Montgomery No. 10976, 1989 WL 567 (Jan. 4, 1989), that a domicile is a "permanent home to which one intends to return in event he should leave," the trial court held,

> Nothing in the phrase "legal residence of domicile" suggests an ambiguity. The Minser case supports CIC's contention that under the accepted meaning of "domicile" under Ohio law, a person can have only one domicile at a time. Moreover, the

6

undisputed facts clearly point to Florida as James Schill's legal domicile.

{¶ 20} Spaeth appealed the trial court's decision to the Eighth District Court of Appeals. Robert assigned his coverage claims to Spaeth as part of a settlement, and Spaeth pursued the appeal. The appellate court reversed the judgment of the trial court. It agreed that there was no genuine issue of material fact in the case, but concluded that reasonable minds could only find that James was a resident of Ohio:

> James is not a typical "snowbird" who travels to Florida for the winter. Because of James's considerable finances, he created two locations in which he carries on important parts of his life. Nonetheless, in reviewing the evidence in Spaeth's favor as required under Civ.R. 56, reasonable minds can come to but one conclusion about the location of James's domicile. *Zivich* [*v. Mentor Soccer Club, Inc.*]*,* 82 Ohio St.3d 367, 696 N.E.2d 201 [1998]. Based on the foregoing facts and conclusions, we conclude James never abandoned his domicile in Ohio by virtue of his wife's purchase of a second home in Florida because he travels here and stays at the Ohio House for up to a minimum of two weeks every month to operate an Ohio business as its CEO and Chairman. Through his own admission, James may have intended to make Florida his domicile, but he "flunked retirement" and his actions after 1993 contradict an intention to make Florida a permanent home.

*Spaeth v. State Auto Mut. Ins. Co.*, 8th Dist. Cuyahoga No. 97715, 2012-Ohio-3813, ¶ 39.

{¶ 21} Accordingly, the court held that Robert was an insured under the CIC policy as a resident relative "because he resides in both James's household *and* his legal residence of domicile." (Emphasis sic.) *Id.* at ¶ 40.

{¶ 22} CIC appealed to this court, raising two propositions of law. This court accepted jurisdiction on only one of them. 134 Ohio St.3d 1466, 2013-Ohio-553, 983 N.E.2d 367. That proposition is as follows: "A Person Has Only One Domicile: Where the Person Resides and has the Intent to Remain Permanently and Return to When Away Temporarily." We did not accept jurisdiction on CIC's proposition that the appellate court had engaged in weighing of evidence and that it should have remanded the factual issues to the trial court for further proceedings.

Law and Analysis

{¶ 23} "Home is the place where, when you have to go there, / They have to take you in." Robert Frost, *The Death of the Hired Man* (1914), available at http://www.poets.org/poetsorg/poem/death-hired-man.

{¶ 24} Ohio law is less poetic, but more precise: " 'In a strict legal sense, that is properly the domicile of a person where he has his true, fixed, permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning.' " *Sturgeon v. Korte*, 34 Ohio St. 525, 535 (1878), citing Story, Conflict of Laws, Section 41. A domicile is "the technically pre-eminent headquarters that every person is compelled to have in order that certain rights and duties that have been attached to it by the law may be determined." *Williamson v. Osenton*, 232 U.S. 619, 625, 34 S.Ct. 442, 58 L.Ed. 758 (1914).

{¶ 25} "Residence in fact, coupled with the purpose to make the place of residence one's home, are the essential elements of domicile." *Texas v. Florida*,

306 U.S. 398, 424, 59 S.Ct. 563, 83 L.Ed. 817 (1939). A person can have a residence that is not his or her domicile:

> Because "domicile" and "residence" are usually in the same place, they are frequently used as if they had the same meaning. "Domicile," however, means living in a locality with intent to make it a fixed and permanent home, while "residence" simply requires bodily presence as an inhabitant in a given place.

*Fuller v. Hofferbert*, 204 F.2d 592, 597 (6th Cir.1953). Thus, a person can have multiple residences, but can have only one domicile. *Grant v. Jones*, 39 Ohio St. 506, 515 (1883). "The law ascribes a domicile to every person, and no person can be without one." *Sturgeon* at 534.

{¶ 26} *Sturgeon* describes three types of domicile: by birth, by choice, or by operation of law. *Id.* "Domicile of birth remains until another is chosen, or where a person is incapable of choosing, until one results by operation of law." *Id*. *Sturgeon* sets forth the two requirements of a change of domicile:

> To acquire a new residence or domicile, where one is under no disability to choose, two things must concur—the fact of removal and an intention to remain. The old domicile is not lost or gone until the new one is acquired, *facto et animo*. It is not, however, necessary that the purpose to acquire a new residence should exist at the time of removal.

*Id*. That is, for a change in domicile to be established, the person must have a physical presence in the new residence and intend to stay there. "The essential fact that raises a change of abode to a change of domicil is the absence of any

intention to live elsewhere (Story, Conflict of Laws, § 43)." *Williamson,* 232 U.S. at 624, 34 S.Ct. 442, 58 L.Ed. 758. Domicile cannot be temporary or transient:

> If [a person] lives in a place, with the intention of remaining for an indefinite period of time, as a place of fixed present domicile, and not as a place of temporary establishment, or for mere transient objects, it is to all intents, and for all purposes, his residence. [Story, Conflict of Laws,] § 46. *Bruce* v. *Bruce*, 2 Bos. & Pull. N. 228; *Sears v. City of Boston*, 1 Met. 250. These are well settled rules relating to the selection or change of residence, existing when the constitution was adopted, and consequently apply in all cases where a change of residence results from or depends upon choice. The question is, and must always remain, one of fact, often attended with much difficulty; but to be determined by the preponderance of evidence favoring one place as against another.

*Sturgeon,* 34 Ohio St. at 535.

{¶ 27} *Sturgeon* was an election matter concerning whether the residents of an infirmary for the poor, who had come to the infirmary from other townships, could vote in the township where the infirmary was located. A probate court judgeship hung in the balance—if the votes of the residents of the infirmary were not counted, the putative victor would lose the election. This court reasoned that the infirmary residents were not kept in the facility against their will and could leave if they desired. Thus, they had the ability to choose the infirmary as their residence. *Id.* at 536. That ability to leave the infirmary meant that the residents could fulfill the intent requirement of domicile:

> Persons may be, and often are, so needy and helpless as to make it reasonably certain that the remainder of their days will be spent in the infirmary; and when this is the case, the infirmary is to such persons, in the full sense of the term, their habitation or home. If the inmate is a voter, and has no family in another township, and has adopted the infirmary as his abode, looks upon and treats it as his home, and has been sufficiently long a resident, he is entitled to vote at all elections in the township wherein the infirmary is situated.

*Id.* at 537.

{¶ 28} This court dealt with another domicile case in *In re Hutson's Estate*, 165 Ohio St. 115, 133 N.E.2d 347 (1956), where the issue was which municipality would be owed inheritance tax on the decedent's estate. Hutson, the decedent, had lived in Bethel, Ohio, since 1891, when he was 16 years old, and almost continuously until 1948. In late 1948, sickness led him to stay with a sister in Batavia, and then with relatives in Amelia, where he eventually spent the last two and a half years of his life, dying in 1952. He maintained a mailing address in Bethel for the receipt of his checks, dividends, and business correspondence until his death and made statements during trips back to Bethel that he expected to return there. On the other hand, he had moved all of his personal belongings to Amelia, including furniture, china, and silverware. He filed a tax return in 1950 giving his residence as Amelia and voted in an election there that year.

{¶ 29} This court did not break new ground in *Hutson*; the opinion's guts are a lengthy quotation from the trial court that sets forth that court's reasoning for its determination that Hutson had never truly intended to abandon Bethel and

thus retained it as his domicile. The trial court had found that Hutson could reside in one place and be domiciled in another:

> "Can one live or reside in one place and have a bona fide intention that another place shall be his domicile? The evidence adduced would seem to show that decedent while a resident at both Batavia and Amelia evidenced an intention and a resolve to return to Bethel at some undetermined future time. Such an intention negatives a severance of his life-long domicile at Bethel."

*Hutson* at 118, quoting the trial court's opinion.

{¶ 30} This court's holding was merely that "it is apparent that there was evidence on which the trial court could well base the conclusion that the decedent did not intend to change his domicile. Hence it is not the province of this court to disturb the judgment." *Id.* at 119-120.

{¶ 31} Still, *Hutson* illustrates the necessity of intent in establishing domicile. We agree with the court in *Redrow v. Redrow*, 94 Ohio App. 38, 44, 114 N.E.2d 293, 296 (1952), however, that intent cannot be based on mere wistful yearning:

> "If a person has actually removed from one place to another, with an intention of remaining in the latter for an indefinite time and as a place of fixed present domicile, such latter place is to be deemed his place of domicile notwithstanding he may entertain a floating intention to return to his previous domicile at some future period. The intention to retain a former domicile is unavailing if it is doubtful, vague, or equivocal."

12

*Id.,* quoting 17 American Jurisprudence 609, Section 31. Home may be where the heart is, but the rest of a person must be there, too, to establish domicile.

**{¶ 32}** The motive behind the intent to establish a domicile is immaterial. In *Williamson*, 232 U.S. 619, 34 S.Ct. 442, 58 L.Ed. 758, the person whose domicile was at issue had moved to Virginia for an indefinite time so that she could sue her ex-husband, a West Virginia citizen, in federal court. The court held that if the plaintiff did not contemplate an end to her time in Virginia, "the motive for the change was immaterial; for * * * the plaintiff had a right to select her domicil for any reason that seemed good to her." *Id.* at 625.

**{¶ 33}** In this case, the court of appeals reversed the judgment of the trial court, concluding that reasonable minds could only conclude that James Schill was domiciled in Ohio. We hold that the opposite is true. The court of appeals states, "Through his own admission, James may have intended to make Florida his domicile, but he 'flunked retirement' and his actions after 1993 contradict an intention to make Florida a permanent home." 2012-Ohio-3813, at ¶ 39. We hold that James's regular work activity in Ohio does not contradict an intent to make Florida his permanent residence, nor does it change the fact of his residence in Florida. James's clear intent was to work part-time in Ohio and be domiciled in Florida. He has meticulously ordered his life to make that so.

**{¶ 34}** James testified that there were tax reasons—Florida's lack of an income tax on individuals—for moving to Florida. As the court stated in *Williamson*, the motive for a change in domicile is immaterial. For approximately 15 years before the accident at issue (and 18 years before his second deposition in this case), James lived in Florida and worked part-time in Ohio. He planned his time spent in Ohio to fall under the number of days that Ohio law considers presumptive evidence of being domiciled in Ohio. He stated that he generally stays in Ohio less than 150 days per year, because "that used to be the statutory

period for residency." He stated that at all times he was aware of the applicable legal requisites to avoid Ohio residency.

{¶ 35} R.C. 5747.24 defines domicile for income tax purposes in Ohio. Pursuant to R.C. 5747.24(B)(1), a person with no more than 182 "contact periods" in Ohio in a year can file a form with the tax commissioner that creates an irrebuttable presumption that the person is domiciled outside of Ohio. That form requires a statement from the individual that he or she was not domiciled in Ohio during the taxable year and that during that year he or she had at least one abode outside the state. James never filed that form. That means, pursuant to R.C. 5747.24(C), that James would be presumed domiciled in Ohio for tax purposes. But R.C. 5747.24(C) also provides that a person "can rebut this presumption * * * with a preponderance of the evidence to the contrary." There is no evidence that James has ever been challenged by the state of Ohio in regard to his domicile; his testimony demonstrates that he would be prepared to rebut a statutory presumption against his Florida domicile.

{¶ 36} James's time in Ohio was devoted almost entirely to work. He rose each morning at 4:00 A.M, went to the ChemTechnologies office, returned to Auburn Township by 7:00 in the evening, and retired to bed by 8:00 P.M. He testified that after coming to Ohio, he always returns to Florida, which he considers his home. The following colloquy in a deposition exemplifies James's intent regarding domicile:

> Q. All right. And so in all fairness, when you're in Florida, you consider that your primary residence?
> A. Absolutely.
> Q. And that is your residence for tax purposes, correct?
> A. It is my residence, period.
> Q. All right. Including for tax purposes, correct?

A. Oh, sure.

Q. And when you're up here in Ohio for purposes of operating your business at ChemTechnologies, your residence is on Orange Lane 12 to 15 days a month?

A. You and I have a problem on the definition of residence. It is my intention to stay at 16800 [Orange Lane] when I'm here. I don't believe I reside there.

Q. All right. And what is it that makes you think you don't reside there?

A. Because I consider residing to be a permanent location for all purposes.

{¶ 37} We recognize that "[w]hile one's statements may supply evidence of the intention requisite to establish domicile at a given place of residence, they cannot supply the fact of residence there; * * * and they are of slight weight when they conflict with the fact." *Texas v. Florida*, 306 U.S. at 424-425, 59 S.Ct. 563, 83 L.Ed. 817. James's statements of intent do not conflict with the fact of his residence. His deposition testimony demonstrated his own belief about where he is domiciled and established his intent to remain there. This is coupled with objective facts. His wife was domiciled in Florida, he voted in Florida, registered automobiles in Florida, paid taxes in Florida, attended church in Florida, and used a Florida doctor and dentist. His social security payments are automatically deposited into his bank account there. When he files his federal tax return, he uses a post-office box in Florida as his address. He maintains personal checking and savings accounts in Florida. His business records are kept in Florida. He receives a per diem for the time he spends in Ohio. This case is devoid of the type of testimony received in *Hutson*, where witnesses testified as to the decedent's wish to one day return to his longstanding home. Here, we have a live

witness, unequivocal in his responses and ordered in his affairs. The nature of his contact with Ohio is transient—he works, and then he leaves. He has stated that he intends to return to Ohio to work for as long as he is physically able. This means that he will stop coming to Ohio when he is physically unable to work; at that point, he will remain in Florida. Undoubtedly, he works in Ohio. But Florida is his domicile. The court below erred in holding otherwise.

{¶ 38} Therefore, since Robert did not have the same "legal residence of domicile" as either of his parents, he was not an insured "resident relative" under the umbrella policy at issue. Accordingly, we reverse the judgment of the court of appeals.

Judgment reversed.

O'CONNOR, C.J., and O'DONNELL, LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

————————————

Weston Hurd, L.L.P., Shawn W. Maestle, John G. Farnan, and Melanie R. Shaerban, for appellant.

The Linton Law Firm Co., L.P.A., Robert F. Linton Jr., and Stephen T. Keefe Jr.; and McCarthy, Lebit, Crystal & Liffman Co., L.P.A., and Christian R. Patno, for appellee.

————————————